May it please the Court, my name is Scott Wellman. I am the attorney for the appellants. I'd like to reserve five minutes for rebuttal. Thank you. Your Honors, I would like to start out with what I believe is the most important part of this appeal, and that is the lifetime injunction banning the appellants from an entire industry. This lifetime injunction is so broad that it prevents all six of the defendants from engaging in any part of the personal protective equipment industry. It's not limited to PPE related to COVID, but extends to any and all PPE. They are not permitted to manufacture or sell ointment to treat foot fungus. They are not permitted to manufacture or sell products that treat cuts. It's a very broad injunction, and our standard of review is abuse of discretion. If we wouldn't have done it, if we were the district judge, the question is whether it's so far out of bounds given the evidentiary record here and the particular prior record with respect to one of the defendants, whether or not that's abuse of discretion. Why don't you focus on that? Thank you, Your Honor. Your Honor, our Supreme Court in Califano v. Yamasaki, the circuit in Lamb Weston v. McCain Foods, as well as every other circuit in the nation, have made it clear that an overbroad injunction is a manifest abuse of district court's discretion. An injunction must be narrowly tailored only to remedy the harm that was caused. It must not be punitive. It must be fair. After all, it comes from the word. It's equitable. It comes from the word ad equitis, which means fair in Latin. And it must not do more harm than good. These are all aspects of what makes an injunction overbroad. But here, every one of these fundamental basic tenets was violated by the court below. Let me put some context. We are not talking about price gouging. We are not talking about misrepresenting the quality of a product. This is not like the figgy court. I'm not sure it's correct to say we're not talking about misrepresenting the quality of the product as part of the claim, at least with respect to the protein powder data. Your Honor, and I will get to that later, but one thing that is clear, the protein powder, which was sold by just one of the appellants, one defendant, only sold $14,000. That's it, an entire tenure that it was sold. So there is issues of whether or not it was misrepresented in that one Vietnamese TV interview. But that's the protein powder. And to me, that was a red herring. The main part of this case is a hand sanitizer. And this is not like the FTC versus figgy where the court gave the example of someone selling rhinestones when it was represented to be diamonds. They represented they were selling hand sanitizer. They sold hand sanitizers. It's like representing diamonds and selling diamonds, but maybe selling it a day late or delivering it a day late. What we are talking about are delay in shipments that occurred during a global one. It's just not accurate to say that it's a red herring because right in the district court's decision, when he's explaining why he's choosing to oppose this injunctive remedy, he refers to the prior problems with Dr. J and then says, undeterred by this punishment, Dr. J nevertheless continued her apparent streak of dishonesty and deceit by misrepresenting on a Vietnamese language broadcast that basic immune IgG could prevent or at least minimize the risk of COVID-19 infection and was approved by the FDA for that purpose. Those were his findings. That's why he imposed it. And that's serious misconduct. And so that factors into our review of whether he abused the discretion. We can't sort of set that aside unless the findings are wrong. Agreed, Your Honor. That was one of six defendants. That was one of six defendants that sold the basic IgG immunity supplement. And by the way, this injunction does not prevent Dr. J from selling the supplement. The supplement is not a PPE, which is kind of the irony in the whole thing. Oh, I'm sorry, Your Honor. Can you hear me? Yes, Your Honor, I can. Would it satisfactorily narrow the injunction if all it did was say Jackie Nguyen is out of the industry for life? I believe that that would have been a much fairer injunction and one that could probably sustain scrutiny, Your Honor. I do. And as part of the fencing-in orders that I know courts are inclined to make, a fencing-in order would have been what you just articulated, preventing Ms. Nguyen from being involved in the PPE industry but not applying it to the other five defendants. Now, for perhaps misrepresentations regarding the protein powder, I think you just said that's not a PPE at all? That is not a PPE, which is the irony of this whole thing. The injunction prevents, bans them from the PPE industry, but a supplement is not a PPE. It doesn't treat disease or infection, which makes no sense. But if I can get back to – Let me interrupt with one question before you cut it off at this point. I don't know if the FTC will say this, but one question, the statement you just made about separating out the defendants, occurs to me. Did you argue below when you were before the district court that there was a basis for distinguishing between Ms. Nguyen and I can't remember, is her husband as the other individual? Is that right? Her husband is the other individual, and there's four companies. She runs one company. He runs the other. I don't believe that I did that, Your Honor, but I did not stipulate that they were – But you're now asking us to say that it wasn't a piece of the district court's discretion not to do so, and I'm not denying that you have a sound basis for doing that, but I don't want to hear what the FTC says about that. That's my concern. Yeah, I totally get it, but when analyzing who is the wrongdoer, if you have six different persons and one is the wrongdoer, it just doesn't make sense to apply it to the other five. Except for the following question, maybe you can elucidate my concern. Dr. J, when she did the misconduct that he described in the order, was clearly acting through at least one of the corporations, and so it would at least be her and the corporation through which she acted, but then there's this footnote at footnote three in the order that says, the parties have stipulated that the corporate defendants are a common enterprise and that each is jointly and separately liable for the actions of the others. That suggests that then we're up to five, and so maybe it's just whether the husband should be removed, but why doesn't that footnote – why doesn't the fact that she's acting on behalf of one corporation and then you stipulated that all the corporations are treated together, gets you at least to the five defendants? Well, we did stipulate that the other corporations were involved. We never stipulated that the individuals were jointly and separately. If this court wants to hold up this injunction with respect to all the other corporations, then we have to live by that stipulation. I think it's an abuse of discretion. I'd like to go into why some of the other reasons why it is an injunction can only be granted if there is wrongdoing going on or wrongdoing that is about to occur. This is what Section 13A of the FTC Act says. It's clear and unambiguous. QUIC, Q-I-K, spent over $6 million in August of 2020 to completely redo its business model. It went from selling direct to consumers as a reshipper of product getting from overseas to being one of the five domestic manufacturers of PPE products in this country. And it made it impossible, absolutely impossible once they made that fundamental business model change to violate the MITRE Act. Why? Because they don't get paid until after the goods are received on a wholesale basis by businesses or by government. And so if it's impossible for wrongdoing to occur in the future, then to me it's an abuse of discretion for this court to grant a prospective injunction, which by its very definition is always prospective. There's another reason why this injunction is an abuse of discretion. The court made a finding that the purchases from the offending Google ad amounted to only 10-11% of 45,000 sales made. That means 89-90% of the sales were not a violation of MITRE. That's just not true. I don't know why you're saying that. Your clients made representations, not just in the Google ad, but on all sorts of other platforms. And yes, they didn't all say ships today, but they said ships within three to five days, five to seven, whatever it was. And it turns out that some large percentage of the shipments didn't arrive for more than 10 days. So there were violations of MITRE, not just from the Google ad, but there were many other sources as well. So I'm not sure why you just said that. Your Honor, if I may, I respectfully disagree. And if you can look at the record, page 419 of the record, there is the traffic refer report, which shows the 100 different ad sources, and it shows where each sale came from. From the 45,000 ads, only 6,000 came from Google. 5,000 came from Google. The other 40,000 purchases came from these other sources. There are almost 100 of them, none of which had these shipping claims. Your client's own website, throughout much of the time period, represented that shipping would occur within less than a week, I think is what I'm remembering. So you're making, your clients are making representations to the consuming public that, according to the findings of the district court, had no reasonable basis to believe could be fulfilled. And we're in the land where I think we're entitled, the FDC is entitled to a presumption of reliance that consumers were hearing that message and relying upon it to place an order with your client as opposed to some other more reputable client who might have been more honest about how long it would take to get the incentivizer, right? So I don't think you're going to be able to convince me that the MITRE violations were limited to just this 10% of the sales. I think they're much more widespread than that, and that's exactly what the district court found. This all occurred over a six-week period. By mid-May, there were no further delays. Since mid-May to today, there has never been a delay in shipment. So we're talking about a period where, yes, there were some delayed shipments, but some of these, many consumers got it on time. Some may have received it a day late. Some may have received it a week late, and some may have received it several weeks late. This was during a global pandemic where no one could predict and foresee, including our own government, that the entire global supply chain and all these venerable delivery services like FedEx were going to deliver 100,000 bottles, as they said in writing, from China. This was during no way could our client have known that the Indian government would confiscate all the tens of thousands of bottles that were sitting in the airport of Hyderabad to be shipped here. There's a reasonable basis. They truly thought it was going to be here, and you're right, it didn't get here. But that doesn't mean that they didn't believe it was going to be here. And they worked 16 to 18-hour days, and by May, so we're talking about six weeks or so, they were caught up, and they were one of the few companies that worked so hard to get this product out to the consumer, and there's no analysis. The consumer who gets it one day late is injured as much as the consumer who gets it a week late or three days late. The court just completed it all and said, you're a horrible person. We're making you disgorge all $3 million. I appreciate what you just said, and you're right. This conduct occurred during a relatively confined period. But what I don't think you're appreciating perhaps is just how panicked people were during this point in time, how desperate they were to get hand sanitizer, and how material the representation about how long it would take to receive it was to the consumer's purchasing decision, right? So I think what the findings support is the view that there were a lot of consumers who purchased from your clients when they would have likely purchased from somebody else had it not been for your client's misrepresentation, as it turned out, that they could get the product within X number of days, right? So I don't think you can just excuse your client's conduct by saying, well, everybody, you know, most people eventually did get the product. Maybe it was a day late. Maybe it was seven days late. It doesn't matter. I think the findings are that it did matter. That was the material representation that motivated the purchase. I don't disagree with that. But there was no analysis of if consumers were concerned about getting it a day late or a week late. They all got their hand sanitizer. We know that. Everybody received it. They may have received it a little late. Most of them, from my reading of the record, got it on time. And I understand there's other ads. There's 90% of people did not get the product within the time frame that your client's represented that they would. That is the basis for, you know. I don't think the record says that. Because it says right there, 10,000 bottles were within 30 days. Under Mike Torb, there's no shipping claim. You have up to 30 days to give it. That's on page five of the record. Part of the problem is, you know, in the statement of undisputed facts that's required in the Central District for a summary judgment motion, there's a series of critical paragraphs starting at 168 about what you claimed were the processing times on the GLOE website. And it's a series of statements that you claim 3 to 5, 7 to 10 days, 3 to 5 days, 5 to 7 days, 3 days, 3 to 5, 3 to 7, and every one of them says undisputed next to it. So you conceded that you made all these representations over these various time periods as to when it would come. And the evidence is that it was not shipped within those frames. A very small quantity, Your Honor. We did not concede as to how many. There were 150,000 bottles shipped after May 1st. Everything's on time. We're talking about during a very, and I understand everybody was panicking, but even during that time, many of the bottles were shipped. There was no analysis of how late there were and why they were late and whether they were sitting in bins ready for the U.S. Postal Service to pick up and the USPS wouldn't pick them up because they had their own shortages. None of this was done in a summary judgment. There are questions of fact. But I can see I'm not going to convince you that we're 90% compliant. I buy that. But none of this justifies a lifetime permanent ban from an entire industry. That's where I think the district court went wrong. If he wanted to fence them in, fence them in by saying you cannot do any more direct sales over the Internet. Fencing in by saying only Ms. Nguyen is liable. Fencing in by saying you can't sell COVID-related products. But to say you can't sell to the veterans at the VA an aspirin or foot ointment that they want because they had contracts with the U.S. government, I think does much more harm than good and is punitive and unfair. I only have 52 seconds, so I'm going to stop. Thank you. We'll make sure you have enough time for both. Let's hear from the FTC. Good afternoon, Your Honors. May it please the Court, I'm Mariel Goetz for the Federal Trade Commission. I want to start off with what Judge Collins said about the abuse of discretion standard. That is what we're operating under as to the injunction, and it's a very serious standard. I don't think they've come close to even showing that it's met here. But what about the mismatch? I mean, the fraud identified with respect to protein powder and said there's an injunction for PPE, which is what protein powder is. So the question here is, was the fencing in reasonably related to the violations at issue? Here, Your Honors have recognized the violations at issue spanned both the protein powder claims in which they were misrepresenting that this protein powder could protect you from COVID-19 at a time when there were no vaccines. People were very vulnerable to these misrepresentations. They were misrepresenting the protein powder product, but they were also misrepresenting, in effect, the nature of the hand sanitizer they were selling to consumers. I thought your evidence was just that this one woman, Jackie Nguyen, on a Vietnamese radio show misrepresented the protein powder. You used the word they. I didn't see where there was any evidence at all of misrepresentation of what the hand sanitizer was. Was there? I'm sorry, the question is, was there evidence as to what? Counsel, I think you just invited us to draw the inference that they misrepresented what they sold as hand sanitizer. Yes, Your Honor. What I was getting at was the importance of the shipping time claims to those purchases. Let me ask you a question that your argument made me wonder about. As I read the record, and I want you to educate me if I missed something here, they advertised hand sanitizer, masks and gowns they sold. In this case, it's about the hand sanitizer. There's no claim of wrongdoing regarding masks or gowns. They sold the hand sanitizer. Everybody, or substantially everybody, got the hand sanitizer. It was not misrepresented to be something other than the hand sanitizer that was sold, and the only wrongdoing was representing how quickly they would ship it. They shipped it all, but they shipped it days or weeks late. Is that true under the record? That's more or less true, Your Honor. This case is predominantly about the hand sanitizer. And I think where the rub is, Your Honor. Did you understand my question? I did. And I think where the rub is. It was predominantly about the hand sanitizer. I guess if it was true that unlike the rhinestones and diamonds hypothetical, they represented it as hand sanitizer, they sold it as hand sanitizer, and unlike the consumer frauds where the consumer never gets what he ordered here, the consumers got what they ordered. The only issue was they got it late. It wasn't late under the MITRE 30-day guideline by and large, but it was late under the promised one-day shipping guideline and the other three- to five-day shipping guidelines. Have I got the record right? Yes, Your Honor. We don't contest that the product sold was actually hand sanitizer. The point I'm trying to make, Your Honor, is simply that the availability of the hand sanitizer and why do they need to be excluded from the industry? Why wouldn't an injunction tailored to wrongdoing just prohibit them from advertising shipping dates that they can't meet? Because that's the only thing that you're saying they did wrong was they advertised a shipping deadline that they couldn't meet. A couple of responses to that, Your Honor. So that's not the only thing we're saying they did wrong here. They misrepresented the protein powder product. They told consumers they had. Counsel, can you hear me okay? Again. You say they misrepresented the protein powder. I thought only Jackie Nguyen misrepresented the protein powder. So all of the appellants stipulated in the district court as to the facts that all of the corporate defendants were operated as a common enterprise, were closely intertwined. And beyond that, though, all of the individual appellants conceded individual liability for all of this wrongdoing. They didn't make any argument in the district court that Mr. Tama Batula should not also be liable for the protein powder claims. Ms. Nguyen should not also be liable for the hand sanitizer claims. So I think that ship has sailed, Your Honor, in the district court based on how they litigated this case. Let's suppose we accept that argument. I still don't understand why the injunction would need to prohibit anything but what they did wrong, which was advertising to consumers an earlier shipping date than they were likely to be able to meet. So the district court properly considered all of the relevant factors about whether wrongdoing was likely to recur and what sort of injunctive relief would be necessary to protect consumers going forward. And here what the court found is that given the knowing, deliberate nature of these violations, which were repeated, which took place in a pandemic when consumers were vulnerable to these kinds of misrepresentations, which had to do with products that touched on human health, right? Sanitizer is one of the few things we knew about. Here's why I'm worried about this. It does look to me as though the district judge just decided these are a bunch of crooks. They're out of the industry. Goodbye forever. And that's what his injunction did. I keep thinking about that baby formula shortage that we had a few months ago, what it looked like. It may have resulted just from the government's overbroad prevention of one of, I don't know, five baby food manufacturers in the United States. There can be a lot of harm to consumers if they can't get stuff because the government has said it can't be sold to that many sellers, and there don't seem to be that many sellers of these personal protective products. So there's a real public interest. It's not just the defendant's interest. There's a real public interest in not having the injunction overbroad. Perhaps as a general matter, Your Honor, that's true. I don't think on this record appellants made any sort of factual showing that there was a serious public interest in the availability of having them provide these products to the American public. And I think what the district court properly considered when it was addressing the scope of the injunction was are they still in this industry? Yes. Can they transfer these practices to other types of products? Yes. Does it matter that they no longer are in the business of selling personal protective products to consumers and that they're now selling other kinds of medical products like this flooring and not selling it to consumers? So it matters in the sense that it's something the court can take into account. It does not foreclose the possibility of deciding, based on all of the facts, that in this case a broader injunction is necessary and should be issued. And I guess I would point you to others. Why is it necessary to broker with them from selling foot ointment to the veterans if it's finishing? Because, Your Honor, and I do want to say something about the government contracts point, but because, Your Honor, they've proven themselves to be untrustworthy in selling products that relate to health conditions, including COVID-19, at a time when consumers are especially vulnerable, at a time when people really need these products. And it was a lawful fencing in of their conduct. I don't deny that the foot ointment scenario is one that goes beyond the specific violations in this case. That's the definition of fencing in relief that all of the FTC cases talk about. But your argument is that there's such crooks, it's reasonable to prohibit them from selling foot ointment to the Veterans Administration. Your Honor, I don't think we're arguing that these are bad people or these are crooks. What we are arguing is that the District Court properly fenced in their conduct in order to protect the public going forward based on a demonstrated past record of knowing repeated violations as to multiple products. And that's not even getting to Ms. Nguyen's particular circumstance involving her pharmaceutical license suspension. So I think if you look at the cases talking about fencing in, specifically in the FTC context, so the Supreme Court's decision in Colgate-Palmolive, that was a case where there were three commercials for one minute long about one particular product. And the injunction, the cease and desist order in that case, was expanded to include any product. This is Colgate-Palmolive, one of the biggest consumer products companies in the world. And the Supreme Court said that was enough. You don't need to limit yourself to the precise form of misconduct that happened in this case. It's enough to fence in these defendants to cover reasonably other reasonable adjacent areas where they might venture forth into future violations. And I think this Court said the same thing basically in Sears and Leighton Industries. Can I ask you about your opponent's proposal that perhaps we, and I can't say his name but the husband, that we separate him from Ms. Nguyen? Because the case for, I think, a lifetime ban, it's kind of an extraordinary sanction. It's a serious. Right, stronger perhaps as to her than as to him. It's a serious sanction, Your Honor. I don't dispute that at all. But I think that in this case, the defendants did not ask the District Court to separate out the individual defendants as to the injunction. They didn't make any argument to the District Court at summary judgment that, no, no, no, this injunction is too broad. It should only apply to Ms. Nguyen. Not to a review for plain error. And they're certainly arguing and have argued in their opening brief that this injunction is too broad in this particular respect. And it's, you know, maybe we can get to five, but it seems very hard to get to number six. So, again, they conceded in the District Court that basically all of these operations. The corporations. Not as to Mr. T. They conceded as to the corporations, but they also in the District Court noted this when it denied the requested stay pending appeal. They never contested each individual's responsibility for the entirety of the misconduct. They didn't respond to our argument that they should be individually liable at all. Individual liability requires knowledge and ability to control, and they waived that argument essentially by not responding at all in the District Court. But I think in any event, Your Honor.  So, they said previously we could not only get stuff really fast, but then India banned exports and confiscated our product. FedEx fell apart in terms of its shipping. The U.S. Postal Service fell apart in terms of its shipping and pickup. We did intend to get things to consumers on time, but the whole country basically fell apart. You know, the world fell apart during this early part of the pandemic. And I don't see why that isn't a response in terms of intention and responsibility. So, two points. First on that point, of course, no one was forcing them to go out and tell consumers that they had product in stock that could ship today. Of course, the world was falling apart. We all lived through that. We all experienced that. That's the part they did wrong. They had 2,000 bottles in stock. It had always been enough before. Now it wasn't enough because of the pandemic. So, Your Honor, it's undisputed that appellants had never sold hand sanitizer before March 4th. They went into this line of business to capitalize on the swelling demand. They knew, and they admitted that they knew as early as March 4th that it was going to be difficult to obtain hand sanitizer. They knew that India banned its shipment on March 12th. They never took the Google ad down. They kept making these false claims. I want to ask you about the subject of monetary relief before your time runs out. You know, it seems pretty unusual as a remedy to say you get your money back and keep the product. I mean, suppose somebody sells washing machines and they put on their, you know, website that you'll get delivery within five days. And then you were able to show that 90% of them were delivered on day seven. Can they get all their money back and keep the washing machine? Is that similar to what was done here? I think in that scenario, Your Honor, as in this scenario, the district court has ample discretion to require the product to be returned. We acknowledge that in Figge the product was returned. That was just a part of the order there. The district court in this case perhaps would have been within its discretion to require consumers to return the hand sanitizer. As a practical matter, on this record, there was not a showing that the sanitizer had value to any meaningful number of consumers. And moreover, sending it back might have cost just as much. It doesn't make any sense because you conceded that the product, they got the product they ordered. So it has value. They didn't get it on time, but as to that, they got values. You can't say it has no value. When there's no evidence, it has no value. I would just say, Your Honor, that in this case, there was not a strong reason to require consumers. These were inexpensive products that perhaps could cost as much to return as it cost to purchase. You didn't put any evidence on the record on that point. It was your burden and summary judgment to show that this remedy was appropriate. And you didn't put anything about shipping or return costs in there. I read your separate statement. It's not there. So if there's a gap on that, you lose. You don't get this broad remedy. Respectfully, Your Honor, I think that as to deductions to be made from the total amount of net revenues, that burden's on the defendant under the presumption. The sense that the appropriate standard is total revenue, but it's not. The notion that you would get full refund is the appropriate. That's a punitive remedy. You should only get something that corresponds to the injury, either if you can quantify the loss from the time, or you get something, you paid more and received value that was less, and you get the difference. But this notion that I get the presumptively all the money back and they have to show otherwise, I don't see. And certainly, Figge doesn't support that proposition. I think Figge does support that, Your Honor. I think the part of Figge where the court discusses, the court specifically rejects deducting the value of the heat detectors from the award. Because the remedy said that they can then make the informed choice to keep the heat detectors instead of returning them for refund. It did. So that's the background against which it says everything it says. Fair enough, Your Honor. But I would point, Your Honor, to the 10th Circuit's decision in Kirkendall and the 11th Circuit's decision in McGregor, where the courts of appeals did not require the return of the magazines purchased in Kirkendall or the printer toner that was the subject of the deception in McGregor. So I think that this is a matter that, yes, district courts- I thought you just told us that in Figge, the court did not require the return. And it's pretty plain. No, no, Your Honor. It didn't require the return. Figge did require the return. Figge specifically rejected the argument that the value, the monetary value of the product should be deducted from the total amount. But getting back to Judge Collins' question about whose burden is, you know, on who bears the burden of showing sort of any deductions to the amount, I think if you look at the cases applying this presumption of consumer reliance, Commerce Planet in this circuit, plenty of other groups, the Blue Hippo decision in the 2nd Circuit, lots of cases apply this presumption. And the way it works is the FTC shows the claims to work. It's a rebuttable presumption. It is. It's being explained over and over again. It's rebuttable. It is rebuttable. And here, Your Honor, the appellants did absolutely nothing to show. If you look at their section of their summary judgment brief that dealt with redress, they didn't make any argument that a certain amount should be deducted from the award. They made the argument that we should have to show individual reliance as a legal matter. They didn't point to any facts. They didn't say this other method should be used. And I think that's what, you know, this court held in Commerce Planet. That's the burden of the defendant at that point. And once we've shown that deceptive claims were widely disseminated and that consumers purchased the product and that those claims were material, the burden shifts to the defendant, who's obviously in the best position to know their own records, to know their own customers, and to make some sort of a showing that, well, actually, these consumers didn't rely on those claims. Actually, these consumers got refunds, and you didn't deduct that. Those are the kinds of things that the defendant bears the burden for, and they did absolutely nothing in the district court to meet that burden. Can I ask a question about the value of the product as of the time the district court entered its order? Was there evidence that, in fact, I don't know, all of the hand sanitizer that consumers would have purchased during the relevant time period had expired? So the evidence in the record is that the expiration date was typically two years. That was something Mr. Tim Petula told customer service. Our hand sanitizer typically expires in two years. At the time of the order, I believe it was April 2022, about two years after most of these sales were made. So if not already expired, it certainly was about to expire. So hold on, Judge Michael, let me just finish up with this, and I'll make sure we both have time to get our questions answered. Okay, so what I hear you saying is that in terms of the basic legal principle, perhaps, yes, ordinarily, to get a full refund, the consumer must return the product, as in Figge, as in the washing machine example. But then you want us to carve out perhaps an exception to that general rule here because the product had no value, even if it were to be returned to the defendant. Is that – I'm just trying to figure out what's the – I think, Your Honor, in this case, it's more about the practical purpose of a return requirement like that. At this point, the consumers had already been deceived by appellants. They already didn't get the sanitizer they ordered on the timeline they were promised. Yes, they got sanitizer. But what the record shows, if you look at the consumer complaints, and this is at SER 231 to 43, customer after customer said, by the time this stuff arrived, I had already bought it somewhere else. I don't need this anymore. And I think on a record like that, where defendants don't come forward with any contrary evidence saying, you know, here are a bunch of consumers that have been happily using their hand sanitizer that was shipped late, and those people should be deducted from this award, or therefore we should deduct the value of the product for all customers. When you don't have that kind of evidence, I think it's more than fair for the district court to decide, like many other cases that came before it, to simply award the amount of net revenues absent any other showing by the defendants. I'm sorry, Judge Gontova, you covered what I had. Thanks. Okay. Well, if there are no further questions, I would just ask the court to refer both the redress and the injunctive relief that was ordered below. Thank you. Thank you very much for your comment. Let's put two minutes on the clock for rebuttal, please. Thank you, Your Honors. Ninety percent of our PPE comes from overseas manufacturers. QYK Quick is or was only one of five domestic manufacturers. It can no longer supply that product. This injunction, because of its breadth, does more harm than good and severely hurts the American public. Figge. In Figge, the court never ordered the entire gross revenue to be put into a redress fund. It ordered the net profits to be put in a redress fund. And it said if there is more than this, then they can go back to the defendant, Figge, and the Figge defendant will need to put in more. But this notion of having to put 100% of their revenue into a redress fund, when we know that there was no late shipments after May, is punitive, which is specifically prohibited by Section 19. Well, the revenues were not outside the relevant time period. It was the revenues from the sales during the time period when there were mitra violations. Your Honor, they were all the revenues, and it went all the way through the end of the year. They were all the revenues, $3 million of which only $300,000 came from the Google ad. No, but, yeah, again, forget it. No, I understand. I've already, I should probably concede on that argument. Okay. Lastly, if somebody had returned or returns hand sanitizer that is full, that tells me the person's not satisfied with that. The whole purpose of showing dissatisfaction and returning is that you're not satisfied with it. To allow them to keep it, use it, and get a full refund is also punitive in my mind and inappropriate. Thank you. Thank you very much, Your Honor. Please just argue to submit it, and we are adjourned for this session. All rise. This court for this session stands adjourned.
judges: KLEINFELD, WATFORD, COLLINS